UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ROBERT JAMES CARTER,

                Petitioner,

v.

JOHN DAVIDS,

                Respondent.

_____/

Case No. 1:19-cv-555

Honorable Janet T. Neff

## <u>OPINION</u>

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

**Discussion**

## I.     Factual allegations

Petitioner Robert James Carter is incarcerated with the Michigan Department of Corrections at the Ionia Correctional Facility (ICF) in Ionia County, Michigan.  Following a six-day jury trial in the Wayne County Circuit Court, Petitioner was convicted of armed robbery, felony murder, and a felony firearm violation.  On November 21, 2016, the court sentenced Petitioner to concurrent prison terms of 20 to 40 years for armed robbery and life imprisonment for felony murder, both consecutive to a sentence of 2 years for felony-firearm.

The Michigan Court of Appeals described the facts underlying Petitioner convictions as follows:

> Defendant and Drakile Jones, were convicted in separate jury trials of robbing and murdering Phillip Pentecost.[1]  Around midnight on January 26, 2016, defendant and Jones went to the home of Justin Harris, with whom Jones had spoken earlier in the day about getting together.  Shortly before arriving at Harris's house, Jones called him and inquired about "hitting licks" (which meant getting some money) and also about whether Harris had a "stick" (meaning a gun).  Jones informed Harris that he had a friend with him (defendant), and when Harris indicated he was not interested in meeting anyone at that time, Jones reassured Harris that he need not worry because defendant was so loyal to Jones that "he would blow [Harris] if [Jones] told him to," meaning he would "shoot" or "kill" Harris.  Harris did not take this as a threat, but rather as Jones vouching for defendant's loyalty.
>
> Jones subsequently arrived at Harris's home with defendant.  Harris was there with a cousin and a friend.  Jones discussed "hitting licks" with Harris and again asked whether Harris had a "burner" (a gun).  Defendant stood nearby but did not participate in the discussion.  Defendant was armed with a handgun.  Eventually, Jones and defendant left the house.  Harris testified that Pentecost's car, a black Chevrolet HHR, was parked in a driveway two houses away with the engine running; Harris could not determine if Pentecost was inside the car.
>
> Harris went back inside, but shortly afterwards he heard a gunshot, a scream, and then another gunshot.  He then saw Pentecost's car speeding away and went outside to find Pentecost lying on the ground bleeding from his head.  Harris called 911, got a towel to hold to Pentecost's head, and stayed with him until the police and ambulance arrived.  Harris found an iPhone next to Pentecost, which he assumed belonged to Pentecost.  He picked it up, but the police took it from him and later determined that it was defendant's cell phone.  Harris testified that shortly after he

2

went back inside his home, he spoke on the telephone with Jones who told him not to admit to the police that he had seen Jones. Harris was interviewed by the police and did not initially mention defendant or Jones. However, in later interviews he admitted that defendant and Jones had been present at his home, and also told them about Jones's call.

An autopsy determined that Pentecost had been shot twice: once in the abdomen and once in the head. Either shot would have been fatal.

Tavion Williams[2] testified that defendant came to his house and asked for his help in hiding a black Chevrolet. Williams and defendant drove the vehicle around the block and parked it behind a store. The following morning, defendant told Williams about the robbery and shooting. Defendant left at Williams' request. Defendant returned that night and asked Williams to help dispose of the black Chevrolet; Williams refused and defendant left.

Subsequently, the fire department discovered a black Chevrolet HHR on fire behind an abandoned house. It was determined that the fire had started in the passenger compartment; a hidden vehicle identification number revealed the vehicle's owner and it was determined that there was a "hold for homicide" notification associated with the vehicle.

Eventually, a search was conducted of defendant's apartment. The police discovered a leather jacket that had belonged to Pentecost. The police also used tracking software to follow where defendant's and Jones's cell phones had been during the time immediately before the murder and for the day after the murder. Defendant was interviewed by the police and gave several inconsistent versions of what happened during the robbery and murder. Eventually he blamed the events on Jones, claiming that Jones had forced him to participate in the robbery and then had shot Pentecost. Based on this claim, defendant subsequently offered a duress defense at trial. Defendant also admitted that he drove Pentecost's vehicle away from the scene and later disposed of it.

---

[1] Jones was tried by a separate jury some months before defendant's trial and his appeal, Docket No. 334635, has been submitted jointly with defendant's appeal.

[2] Williams's first name was spelled Taevion in Jones's trial.

(Mich. Ct. App. Op., ECF No. 1-1, PageID.77-78.)[1]

Petitioner, with the assistance of counsel, appealed his convictions to the Michigan

Court of Appeals, raising the same four issues he raises in this petition. By opinion issued February

---

[1] Petitioner attaches his appellate brief to the petition. That brief recounts the pretrial proceedings and the trial testimony in some detail. (Pet'r's Appellate Br., ECF No. 1-1, PageID.15-24.) Petitioner's description of the testimony is consistent with the summary provided by the court of appeals. Accordingly, it does not appear that Petitioner takes issue with the reasonableness of the appellate court's factual determinations.

20, 2018, the court of appeals affirmed the trial court. (*Id.*, PageID.77-87.) Petitioner, again with the assistance of counsel, then sought leave to appeal in the Michigan Supreme Court. By order entered September 12, 2018, the supreme court denied leave to appeal. (Mich. Order, ECF No. 1-1, PageID.89.) On November 3, 2019, Petitioner timely filed his habeas corpus petition raising the four grounds for relief he had raised in the Michigan appellate courts:

I.     Was Defendant's trial counsel constitutionally ineffective for not calling Tavion Williams as a witness where Mr. Williams was essentially a res gestae witness who was personally involved in this crime, and would have provided testimony consistent with the Defendant's own duress defense and testimony, and was readily available having testified at Drakile Jones' trial? Is an evidentiary hearing unnecessary to establish ineffective assistance as the transcript of Tavion Williams' prior testimony is attached hereto for this Court's consideration? Was this not harmless error and is a new trial necessary?

II.    Did Judge Kenny abuse his discretion by finding that the prosecutor had exercised due diligence in bringing res gestae witness Anthony Cox-Rodgers to court, and then allowing Anthony Cox-Rodgers' prior testimony to be read into the record because Mr. Cox-Rodgers was making himself scarce despite having appeared for the first day of trial. This evidence tainted the trial, was not harmless, and a new trial is required.

III.   Judge Kenny clearly erred by finding that hearsay statements of Drakile Jones, presented through Justin Harris, were admissible, under the co-conspirator exception. This evidence tainted the trial, was not harmless, and a new trial is required.

IV.    Judge Kenny clearly erred when he found that the Defendant's statement prior to being read his Miranda warnings, while he was in custody, which revealed his iPhone passcode to law enforcement, was testimonial and should have been suppressed, and the evidence obtained as a result including the prejudicial firearms photos used as evidence at trial should have been suppressed as well.

(Pet., ECF No. 1, PageID.3) (corrected for spelling and grammatical errors).

## II.     AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA). The AEDPA "prevents federal habeas 'retrials'"

and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 574 U.S. 1, 4 (2014); *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013); *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012); *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III.    Discussion

####    A.    Tavion's testimony

Petitioner contends that his counsel was ineffective for failing to call Tavion Williams to bolster Petitioner's defense that he committed the crimes under duress.  Petitioner testified that when he balked at going forward with the robbery of Pentecost, Jones threatened to shoot him.  Williams testified at Jones' trial.  Although he did not witness the threats, Petitioner did indicate to Williams, the next day, that Jones threatened Petitioner:

Prosecutor:    Did Robert Carter say that he was with Drakile?

Williams:    Yes. That's what he said.

Prosecutor:    Did he say that he and Drakile were looking to make some money?

Williams:    Yes.

Prosecutor:    Did he say that he and Drakile were looking to rob someone?

Williams:    Yes.

Prosecutor:    He used those words?

Williams:    Yes.

Prosecutor:    What did he say then?

Williams:    He said that they had found someone in particular who they were going to rob.

Prosecutor:    I'm going to stop you there.  Did he tell you how they picked that person?

Williams:    No. He just said he seen someone, and then he chose.

Prosecutor:    What did he say next?

Williams:    He said that Drakile had told him that that's the one who they going to rob.  Robert said he don't think that's a good idea that that's what he should do.  And Drakile told him quit being scared or quit acting like you don't want to go.  They had that little dispute, and he said that Drakile told him that if he wouldn't come, he would turn the gun against him.

7

| | |
|---|---|
| Prosecutor: | Are those the exact words that Mr. Carter used when he was telling you that? |
| Williams: | I'm not sure what his exact words was. That's what he was saying. He said Drakile told him that if he wouldn't come, he would use the gun against him, or he threatened him to come with him. |
| Prosecutor: | That if Mr. Carter didn't go along with the robbery, Drakile would turn the gun against Mr. Carter? |
| Williams: | Yes, sir. |
| Prosecutor: | After he told you about that interaction where Drakile threatened Mr. Carter, did he go on to tell you anything else? |
| Williams: | Yes. He told me that they went to the car, and Drakile had shot the boy, and he told me he had took off in the car afterward. |

(Jones Trial Tr., ECF No. 1-1, PageID.45-47.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court stated that, to establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The Michigan Court of Appeals applied the *Strickland* standard in resolving

Petitioner's claim:

> To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and that a reasonable probability exists that, without counsel's unprofessional errors, the outcome of the proceedings would have been different. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

(Mich. Ct. App. Op., ECF No. 1-1, PageID.79.) Thus, Petitioner cannot claim the state court

applied the wrong standard.

The appellate court applied the standard as follows:

> After the prosecution rested, defendant's trial counsel specifically stated that she was making a strategic decision not to present Williams as a witness. Williams's testimony was mostly inculpatory with respect to defendant and only minimally exculpatory. Williams testified in Jones's trial that he knew both defendant and Jones. He stated that he received a telephone call from defendant on January 27 or 28, 2016, at around 2:00 or 3:00 a.m.; he recognized his voice and he also saw defendant's name appear on the screen. Defendant sounded scared or frantic and said he needed somewhere to go and asked if he could come to Williams's home. When defendant arrived, he called Williams and asked him to come outside; Williams found defendant seated alone in a black Chevy. Defendant told Williams he needed somewhere to put the vehicle, and Williams told him he could put it around the corner. Together they drove the car about two blocks away, parked it behind a store, and then walked back to Williams's house and went to sleep. When they awoke the next morning, defendant told Williams that he had participated in a robbery and someone had been shot. Williams specifically testified: "[Defendant] told me that him and [Jones] was on the west side, and they were looking to make some money." Williams further testified that defendant told him that he and Jones were looking to rob someone and found someone to rob. According to Williams, defendant chose whom to rob. Williams also testified that defendant and Jones argued over whether it was a good idea to go through with the robbery, and according to defendant, Jones threatened to turn the gun against him if he did not participate. Defendant finally told Williams that they went to the car, Jones shot the man, and defendant left the scene in the man's car. Williams denied that defendant had ever told him a third person was involved in the robbery. Further, Williams agreed that defendant had previously sent him photographs of a firearm that were posted on Facebook. He explained to Williams that "his Dad had some guns, and he was going to take them."

Williams testified that he told defendant he had to leave and defendant did so. Later that evening, defendant came back and asked if Williams would help him burn the black Chevy. Williams refused and again told defendant to leave.

Although this testimony provided some support for defendant's claim that he acted under duress because of Jones's threat, it also provided inculpatory evidence that defendant actively planned a robbery with Jones, including selecting the victim, and acted on his own to drive the victim's car away, conceal it, and later return looking for assistance in burning that vehicle. Williams's testimony also linked defendant to the possession of two guns, established that defendant had a Facebook photo with a gun, and contradicted defendant's claim that a third person was involved in the robbery. Moreover, defendant testified in his own behalf and claimed that he was forced by Jones to participate in the robbery. Therefore, he was able to present a duress defense. Given the, at best, contradictory testimony of Williams, as well as the other evidence presented by the prosecution, it is not probable that a different result would have occurred had Williams's testimony been presented at defendant's trial. Moreover, trial counsel was aware of Williams's testimony because it had already been offered at Jones's trial. It was therefore clearly a matter of trial strategy to determine that it was best not to present that testimony and instead to attempt to establish the duress defense through defendant's own testimony, and this Court does not second-guess such strategic decisions. *Russell*, 297 Mich App at 716. Defendant has therefore failed to carry his heavy burden of showing that his trial counsel failed to provide effective assistance.

(*Id.*, PageID.80-81.)

The Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The state appellate court has offered a compelling argument that counsel's decision was purposeful and strategic—that Williams' testimony could hurt Petitioner as much as it could

help Petitioner—and, therefore, counsel's performance did not fall below an objective standard of reasonableness. Because Petitioner only restates the arguments he made to the court of appeals in the first instance, he offers this Court no basis to overcome the deference this Court owes to the court of appeals' application of *Strickland*.

The Michigan Court of Appeals has offered an argument that counsel satisfied *Strickland's* deferential standard. The Court concludes that the argument is reasonable because, as the appellate court noted, Williams testimony undercut Petitioner's duress defense.

In *People v. Lemons*, 562 N.W.2d 447 (Mich. 1997), the Michigan Supreme Court described the circumstances where an instruction of the duress defense is appropriate:

> Duress is a common-law affirmative defense. MCR 2.111(F)(3)(a); *United States v. Bailey*, 444 U.S. 394, 415, 100 S.Ct. 624, 637, 62 L.Ed.2d 575 (1980); 21 Am Jur 2d, Criminal Law, § 148, p 288; 22 CJS, Criminal Law, § 52, p 64. It is applicable in situations where the crime committed avoids A Greater harm. [T]he reasons underlying its existence are easy to discern:

> > The rationale of the defense of duress is that, for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person. [1 LaFave & Scott, Substantive Criminal Law, § 5.3, pp 614-615.]

> In order to properly raise the defense, the defendant has the burden of producing "some evidence from which the jury can conclude that the essential elements of duress are present." CJI2d 7.6, commentary. In *People v. Luther*, 394 Mich. 619, 623, 232 N.W.2d 184 (1975), we held that a defendant successfully carries the burden of production where the defendant introduces some evidence from which the jury could conclude the following:

> > A) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;

> > B) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

> > C) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

> > D) The defendant committed the act to avoid the threatened harm.

*Lemons*, 562 N.W.2d at 453 (footnotes omitted). Petitioner's testimony alone warranted giving the duress instruction. But, the *Lemons* court identified other requirements as well, including the following: "the threat 'must have arisen without the negligence or fault of the person who insists upon it as a defense.'" *Id.* at 454, quoting *People v. Merhige*, 180 N.W. 418 (Mich. 1920).

Williams' testimony would have supported the inference that it was Petitioner's own fault he found himself in the circumstance where he was threatened. He actively planned robbing someone with Jones; he was armed; and he picked the victim. Jones threatened Petitioner with the gun that Petitioner brought for the purpose of committing the robbery. (Pet'r's Appellate Br., ECF No. 1-1, PageID.23.) Moreover, he continued to participate by secreting the vehicle and then burning it, even though, according to Williams, Jones was not present and the threat was not imminent. Therefore, based on Williams testimony, Petitioner failed "to terminate his conduct 'as soon as the claimed duress . . . has lost its coercive force,'" another requirement mentioned in *Lemons*. *Lemons*, 562 N.W.2d at 454 n.18.

Moreover, even if counsel's decision to forego Williams' testimony were unreasonable, the court of appeals conclusion that it would not have changed the result is also reasonable. Williams did not witness the coercive threat. He heard it from Petitioner. The testimony could carry no more weight coming from Williams than it did coming from Petitioner— it depended entirely on Petitioner's credibility. Additionally, Petitioner testified, contrary to Williams, that Jones' threats, directed at both Petitioner and Williams, continued the next day and prompted the burning of the car. (Pet'r's Appellate Br., ECF No. 1-1, PageID.24.) Petitioner's version of the duress defense was enhanced by the absence of Williams' testimony. Accordingly, the court of appeals determination that Petitioner suffered no prejudice is reasonable.

Petitioner has failed to show that the appellate court's determinations regarding the reasonableness of counsel's performance and the absence of any prejudice are contrary to, or an unreasonable application of, *Strickland*. Accordingly, he is not entitled to habeas relief on his ineffective assistance of counsel claim.

### B. Preliminary examination testimony of Cox-Rodgers

Petitioner describes the preliminary examination testimony of Cox-Rodgers as follows:

> Mr. Cox-Rogers had previously testified that he was at Justin Harris' home on January 17, 2016. Harris was an old friend. Two men came over, Drakile Jones and Robert Carter. He had met Drakile previously but did not know Carter. (JT 10/19/16 p. 1-30) Carter and Jones left, then he heard two shots, and Philip was lying on the ground and Phillip's car was driving away.

(Pet'r's Appellate Br., ECF o. 1-1, PageID.22-23.) Petitioner contends that the admission of Cox-Rodgers' testimony is a violation of the Michigan Rules of Evidence regarding hearsay. The Michigan Court of Appeals disagreed. Applying Michigan Rule of Evidence 804, the court of appeals concluded "that the police made reasonable good-faith efforts to locate Cox-Rogers, and that the trial court did not abuse its discretion in determining that the prosecution had demonstrated due diligence and that it was proper for the prosecutor to present Cox-Rogers's prior testimony from the preliminary examination." (Mich. Ct. App. Op., ECF No. 1-1, PageID.83.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to

deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). *See also Thomas v. Stephenson*, 898 F.3d 693, 700 n.1 (6th Cir. 2018) (same). Therefore, to the extent Petitioner challenges the appellate court's determination of the admissibility of Cox-Rodgers' testimony under Michigan Rule of Evidence 804, the issue is not cognizable on habeas review. The Michigan Court of Appeals has conclusively resolved it.

Nonetheless, state-court evidentiary rulings can rise to the level of due process violations if they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The court of appeals acknowledged that hearsay issues under the state rules of evidence touch upon such a fundamental principle of justice in that hearsay evidence implicates the Confrontation Clause. (Mich. Ct. App. Op., ECF No. 1-1, PageID.81.)

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const., Am. VI; *Pointer v. Texas*, 380 U.S.

400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Therefore, the issue of unavailability is significant not only under the terms of the Michigan Rule of Evidence, but also under federal constitutional analysis of Petitioner's confrontation rights. The trial court, and then the appellate court, reviewed the circumstances that prompted the prosecutor to seek the admission of Cox-Rodgers' preliminary examination testimony.

Cox-Rogers testified at the preliminary examination and was cross-examined by defense counsel as well as Jones's counsel. He appeared on the first day of trial and was told to return on October 17, 2016. Arrangements were made for him to be picked up by a taxi cab; however, on the morning of October 17th he apparently called the cab company and told them he was not going to court. The prosecutor requested a material witness warrant pursuant to MCL 767.35, and the court ordered that the witness was to "be picked up and brought before the Court immediately."

Two days later, the prosecutor reported that efforts to locate Cox-Rogers had been unsuccessful and asked to be allowed, pursuant to MRE 804(b)(I), to use his preliminary examination testimony. Defendant's counsel then asked that the officer-in-charge detail the steps that had been taken to secure Cox-Rogers's presence. Officer Michael Crosby then testified that he had been given a witness detainer for Cox-Rogers on October 17th. At one point he made contact with defendant's sister, who told him that Cox-Rogers had just left. He gave information regarding Cox-Rogers, including the address he had for Cox-Rogers and information concerning his place of employment, to the Headquarters Surveillance Unit, which began surveillance of the witness's home, aided by a unit from the Ninth Precinct's Special Operations Unit. Crosby also checked the Wayne County and Macomb County jails. He did not check any hospitals. Crosby testified that Cox-Rogers was not in any morgue.

Noting that Cox-Rogers had appeared on the first day of trial, the trial court ruled that Cox-Rogers was unavailable:

> Yes, I think that is true. So certainly he knew he had to be here because he was here [on the first day of trial]. And [the prosecutor] indicated as an officer of the court, he had instructed Mr. Cox-Rogers that he had to be back. He didn't and specifically told the cab driver who had come to pick him up that he wasn't coming.
>
> Surveillance on his residence, surveillance on his place of work have been fruitless. Sibling has indicated that he had just left. I think a reasonable conclusion to be drawn in light of the fact that he's not in the Wayne County Jail or Macomb County Jail is that Mr. Cox-Rogers has decided to absent himself during the course of these proceedings.
>
> Michigan law requires that in term[ s] of showing unavailability that there must be a showing that what was done was reasonable efforts made to find him.
>
> Surveillance efforts, going to his home to pick him up to actually deliver him here certainly was reasonable. I do think that an adequate record has been made, and certainly the only reasonable inference to draw at this particular point is that Mr. Cox-Rogers is, for want of a better term, laying low until all this is over, and I will allow his Preliminary Examination testimony to be read to the jury.

(Mich. Ct. App. Op., ECF No. 1-1, PageID.81-82.)

Here, the Michigan Court of Appeals carefully considered whether and when the witness became unavailable, the efforts of the prosecution to produce the witness once the prosecutor became aware that the witness would not appear at trial, and the opportunity Petitioner had for cross-examination at the earlier preliminary examination. Petitioner utterly fails to challenge the findings of the court of appeals on these points. He simply contends that more should have been done to assure that the witness would appear. Such a challenge fails to demonstrate that the court of appeals either unreasonably determined the facts or unreasonably applied clearly established Supreme Court precedent.

Although Petitioner does not raise the issue directly, the Sixth Circuit has noted that there exists "some question whether a preliminary hearing necessarily offers an adequate prior opportunity for cross-examination for Confrontation Clause purposes." *Al-Timimi v. Jackson*, 379 F. App'x 435, 437-38 (6th Cir. 2010) (citing, *inter alia, Vasquez v. Jones*, 496 F.3d 564, 577 (6th Cir. 2007) (doubting whether "the opportunity to question a witness at a preliminary examination hearing satisfies the pre-Crawford understanding of the Confrontation Clause's guarantee of an opportunity for effective cross-examination") (internal quotation marks omitted)). But the Supreme Court has never held that a defendant is denied his rights under the Confrontation Clause when a witness is unavailable at trial and the court admits the witness's preliminary examination testimony. *Id.*, 379 F. App'x at 438. As a result, in the context of a federal court sitting on habeas review, the Sixth Circuit has concluded that a state court's determination that testimony from the preliminary examination was properly admitted was not an unreasonable application of clearly established Supreme Court precedent. *Id.*, 379 F. App'x at 438-40; *see also Williams v. Bauman*, 759 F.3d 630, 636 (6th Cir. 2014) (citing *Al-Timimi* with approval and upholding on habeas review the admission of testimony from the petitioner's own preliminary examination).

Finally, even if out-of-court testimonial statements were admitted in violation of the Confrontation Clause, Petitioner would not be entitled to habeas relief. The Sixth Circuit has held that admission of evidence in violation of the Confrontation Clause is not a structural error. *United States v. Graham*, 278 F. App'x 538, 545 n.2 (6th Cir. 2008). Harmless error review would apply. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Under the prevailing harmless error standard, the court must determine whether the Confrontation Clause violations had a "substantial and injurious effect or influence" in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). That determination "depends on numerous factors, including 'the

importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015) (quoting *Van Arsdall*, 475 U.S. at 684). Where the prosecution's case is strong and the violative evidence plays a relatively small role in the conviction, the error is harmless. *Holland*, 800 F.3d at 243.

Petitioner fails to identify how Cox-Rodgers' preliminary examination testimony was anything but duplicative of Harris' testimony, or even Petitioner's own testimony. Petitioner fails to show any prejudice from the testimony and the Court cannot conceive of any possible prejudice under the circumstances.

Petitioner has failed to demonstrate that the court of appeals' determinations are contrary to, or an unreasonable application of, *Crawford*. Nor has Petitioner shown that the factual findings of the trial court or the court of appeals are unreasonable. Additionally, any possible error in the admission of Cox-Rodgers' testimony was harmless. For all of these reasons, Petitioner is not entitled to habeas relief on his claim regarding the admission of preliminary examination testimony.

### C.    Co-conspirator statement

Petitioner next contends that the trial court erred when it admitted a statement by his co-conspirator, Drakile Jones, through the testimony of Justin Harris. Before Jones and Petitioner arrived at Harris's home, Jones and Harris conversed by telephone. When Jones proposed bringing a friend—Petitioner—Harris objected. To convince Harris of Petitioner's

loyalty, Jones told Harris that Petitioner would blow Harris if Jones told Petitioner to do so.[2] (Mich. Ct. App. Op., ECF No. 1-1, PageID.84-85.) Harris testified that Jones's statement meant that Petitioner would shoot Harris if Jones told Petitioner to do so. (*Id.*)

The trial court allowed Harris to recount Jones's statement because the court determined it fell outside the bounds of hearsay under the Michigan Rules of Evidence. Rule 801(d)(2)(E), did not bar the out-of-court statement because the court found it was a statement by Petitioner's co-conspirator during the course of and in furtherance of the conspiracy. (*Id.*) On appeal, Petitioner argued that the prosecutor had not shown a conspiracy and, thus, the statements could not have been made in furtherance of a conspiracy. Therefore, the statement was hearsay and should have been excluded. Moreover, Petitioner argues that the statement was inherently prejudicial in that "the jury most certainly understood this hearsay to mean that Drakile thought Carter was capable of killing someone in a robbery." (Pet'r's Appeal Br., ECF No. 1-1, PageID.29.)

The court of appeals rejected Petitioner's argument, affirming the trial court. After reviewing the evidence regarding the conspiracy, the court stated: "[The] evidence was sufficient to establish the existence of a conspiracy at the time Jones made his statement vouching for defendant's loyalty." (Mich. Ct. App. Op., ECF No. 1-1, PageID.86.) That determination of state law is binding on this Court. Petitioner's claim that the evidence was inadmissible under the Michigan Rules of Evidence, for the reasons stated above, is not cognizable on habeas review.

The court of appeals went on to point out that even if the statement were not admissible under state law, its admission was not outcome-determinative:

---

[2] The Michigan Court of Appeals quoted from Harris's testimony at Jones's trial. Because Petitioner's counsel was aware of this testimony before Harris testified in Petitioner's trial, counsel was able to object before Harris even testified. (Mich. Ct. App. Op., ECF No. 1-1, PageID.84-85.)

> [W]e cannot conclude that the admission of Jones's statement, even if improper, was outcome determinative. The particular statement to which defendant objected was simply Jones's vouching for defendant's loyalty, a matter which defendant's own testimony subsequently established. Defendant's guilt was established by the other evidence showing his possession of the loaded revolver and his participation in the crimes and the subsequent cover-up, not by Harris's testimony concerning a statement by Jones vouching for defendant's loyalty. Therefore, "in light of the weight and strength of the untainted evidence," *Musser*, 494 Mich at 348, this Court concludes that any error caused by the admission of Jones's statement through Harris's testimony would not have been outcome determinative.

(*Id.*) (footnote omitted). That is the equivalent of concluding that the error was harmless. *Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016). "State courts' harmless-error determinations are adjudications on the merits, and therefore federal courts may grant habeas relief only where those determinations are objectively unreasonable." *O'Neal v. Balcarcel*, 933 F.3d 618, 624 (6th Cir. 2019) (citing *Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015)).

In his habeas presentation, Petitioner merely repeats the argument he made in the court of appeals. He does not respond to the appellate court's harmless error analysis; he does not challenge the facts relied upon by the court of appeals to conclude that the admission of the statement was harmless. Indeed, where Petitioner's defense—duress—admits the crime, it is hard to conceive of how Jones's statement could sway the jury. In short, Petitioner has not even attempted to show that the court of appeals' factual determinations are unreasonable and he has failed to show that the appellate court's determination that any error was harmless is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to relief on his habeas claim regarding admission of Jones's statement through Harris's testimony.

### D.    Suppression of the cellphone passcode

The police questioned Petitioner before he was given the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self-incrimination, when an individual

is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478-79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). Petitioner provided police the passcode to his phone before he was given the *Miranda* warnings. That passcode, in turn, was used to obtain photographs that showed Petitioner with guns. Petitioner's trial counsel argued that the phone's contents, including the photographs, should be suppressed. Petitioner's appellate counsel characterized the trial court's ruling as follows:

> Judge Kenny stated, after the evidence was taken and the videos of the interrogations reviewed, that Defendant Carter clearly was in custody when he was asked his phone passcode (which he gave to the police), before he was read his *Miranda* rights. (WH 6/8/16 p. 45) This passcode led to the discovery of all the phone's contents. The prosecutor argued that law enforcement could have obtained a warrant compelling Mr. Carter to give his passcode or fingerprint to open the phone anyway. (WH 6/8/26 p. 48) Judge Kenny found that the [sic] Mr. Carter's statements were voluntarily made, and that the questions about the iphone passcode were akin to booking questions and were not testimonial, [citing *Pennsylvania v Muniz*], so Miranda was not required. Furthermore, the passcode would have[,] reasoned Judge Kenny, inevitably been discovered pursuant to a search warrant and evidentiary items found on the phone as a result should not be suppressed. (Photos of the defendant and handguns, primarily) (WH 6/8/16 p. 63.)

(Pet'r's Appeal Br., ECF No. 1-1, PageID.31.) Petitioner's appellate counsel then presented the suppression issue to the court of appeals as follows:

> The question in this case is not so simple, however. *It may be that the Defendant would have had to give up his fingerprint if that would have opened the phone*, but passcodes should be considered protected testimonial information by the courts. This issue has not yet been decided by the Michigan appellate courts, but at least one other jurisdiction has held this to be the case. See *Virginia v. Baust* No. CRl41439 (Va. Cir. Ct. Oct. 28, 2014) In the instant case, it may have been that if the Defendant had not given his passcode without Miranda warnings, the court might have been able to compel him to use his fingerprint-but that is not the issue before this Court. *This court must decide only whether or not Judge Kenny erred in finding that the passcode statement was not testimonial*. This Court should find that it clearly was testimonial. It is not the same type of information held to be admissible in *Muniz* (name, address etc). A new trial is necessary, where the pictures taken from the cell phone are excluded.

(*Id.*, PageID.31-32) (emphasis in original).

    The Michigan Court of Appeals concluded that Petitioner had misconstrued the trial court's ruling:

> It is apparent to this Court that defendant has misunderstood the trial court's ruling, and that therefore the issue raised by defendant on appeal is meritless because it has already been decided in his favor by the trial court. Contrary to defendant's claim on appeal, the trial court did not rule that the passcode for the cell phone was non-testimonial information that did not violate defendant's Fifth Amendment right against compelled self-incrimination; in fact, the trial court agreed that asking for the passcode was *not* a routine "booking question" and that the police questioning and defendant's answer violated *Miranda*. However, the trial court ruled that the police would have inevitably obtained access to defendant's cell phone because they could have obtained a search warrant for his fingerprint to unlock the phone and therefore, the data and photographs were admissible based on the inevitable discovery exception to the exclusionary rule.
>
> We note that there is a Fourth Amendment concern that is triggered by searches of cell phones conducted without either the owner's consent or a search warrant. This concern is not presented by defendant's argument. Instead, defendant addresses only the Fifth Amendment concern that asking for the passcode of his cell phone constituted testimonial compulsion.
>
> Preliminarily, the parties, and the trial court, all agreed that asking defendant for the passcode to his cell phone was not a "booking-type" inquiry. Therefore, contrary to defendant's position and argument on appeal, the trial court agreed that police questioning asking for defendant's cell phone passcode, and defendant's act of providing the passcode, did not amount to routine booking information requests or responses, and the trial court accordingly suppressed defendant's response for use in the prosecution's case-in-chief. However, the trial court also ruled that despite the access that the police gained to defendant's cell phone because he provided them his passcode, the data and photographs that were obtained as a result would not be suppressed because they would have been inevitably discovered when the police obtained a search warrant for the cell phone's contents and forced defendant to provide his fingerprint to unlock the cell phone. Defendant argues on appeal, "it may have been that if the Defendant had not given his passcode without *Miranda* warnings, the court might have been able to compel him to use his fingerprint--but that is not the issue before this Court." But contrary to defendant's claim, that is the only issue that could be before this Court, and it is not an issue that defendant has raised. Instead, defendant has raised only an issue upon which he prevailed in the trial court, and has specifically told this Court it need not address the only issue the trial court ruled upon unfavorably to the defense.

(Mich. Ct. App. Op., ECF No. 1-1, PageID.86-87.)

Petitioner presents the same argument to this Court that he presented to the court of appeals. He does not challenge the court of appeals' findings regarding the trial court's resolution of his Fifth Amendment challenge. He does not change his challenge to one based on the Fourth Amendment. He simply raises his Fifth Amendment argument again.

As the Michigan appellate court was constrained, so this Court is also constrained to resolve the issue as Petitioner has raised it. The Court can grant no relief on the Fifth Amendment self-incrimination issue because the state courts have already resolved it in Petitioner's favor. The Court can grant no relief on the failure to suppress the phone contents under the Fourth Amendment because Petitioner has not raised it; indeed, he expressly disclaims that he is raising that issue.

The state courts' application of the inevitable discovery doctrine to permit admission of evidence obtained as a result of information obtained during an "unwarned" custodial interrogation is entirely consistent with clearly established federal law. *Nix v. Williams*, 467 U.S. 431 (1984). Moreover, Petitioner's ability to challenge the state courts' determination of the Fourth Amendment issue is limited under the rule announced in *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id.*; *see also Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012).

For the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas

review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

In the present case, Petitioner cannot satisfy either prong of the *Stone v. Powell* standard. First, it is beyond dispute that Michigan has a state procedural mechanism that provides a defendant a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment. *See, e.g., People v. David*, 326 N.W.2d 485, 488 (Mich. Ct. App. 1982). Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, to satisfy the remaining prong of *Stone v. Powell*, Petitioner must allege facts showing that the state corrective mechanism has somehow broken down. *See, e.g., Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim). Here, Petitioner was afforded a hearing on his motion to suppress before the trial and the parties presented the issue of whether the contents of the phone would have been inevitably discovered under the Fourth Amendment.

Under the circumstances, Petitioner has failed to show that the state appellate court's determinations of fact on this issue are unreasonable or that the court's failure to provide

relief on his claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to habeas relief on this claim.

### IV.     Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.  Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial

of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.


Dated:   November 14, 2019                    /s/ Janet T. Neff
                                              Janet T. Neff
                                              United States District Judge